UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Tinka Douris, et al.,

        Plaintiffs

v.

City of Henderson, et al.,

        Defendants

Case No. 2:22-cv-00371-CDS-EJY

**Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Closing Case**

[ECF No. 8]

Stephen Douris was fatally shot in his driveway by two Henderson Police Department (HPD) officers on February 29, 2020. Just before, his sister, Tara Douris, had called 911 for emergency assistance in containing Stephen, who was in the midst of a mental health crisis and had threatened and physically assaulted Stephen and Tara's parents.[1] When emergency responders had not yet appeared, Tara called 911 a second time and requested a faster response, warning them that Stephen had a knife. Defendant HPD Officers Travis Nusbaum and Donald Okami arrived at the scene minutes later and parked a few houses down from the Dourises' residence. Their bodycam footage corroborates the following sequence of events, all occurring within a ten-second span.

The officers exited their respective vehicles and ran to meet Tara and her mother on the sidewalk. The officers warned Tara and her mother to stay back, and then they moved toward the Dourises' residence. As they approached the garage, they saw Stephen for the first time: chasing his father with a knife. Stephen saw the officers and advanced toward Okami while brandishing the knife. Okami said "stop" and "show me your hands." Stephen marched forward while Okami stepped backward. Okami then fired a single shot from a 40mm beanbag shotgun

---

[1] Throughout this order, I refer to the plaintiffs by their first names to distinguish amongst them, as they share the same last name.

into Stephen's chest. The beanbag bounced off Stephen and landed in the street. Stephen turned toward Nusbaum and accelerated, closing the distance between himself and Nusbaum. Tara and her mother were directly behind Nusbaum. Nusbaum began to retreat backward on the sidewalk, started to draw his pistol, and commanded Stephen to "drop it." Stephen continued to advance. Okami drew his pistol as well; when Stephen came within approximately eight feet of Nusbaum, both Okami and Nusbaum fired their weapons. Their shots struck Stephen in the torso, and he keels over. Eight seconds elapsed between the officers' first sighting of Stephen and the shootings. Shortly thereafter, Stephen died from the gunshot wounds.

        Stephen's estate and the Dourises (Stephen's wife, Tinka; parents, Earl and Debra; sister, Tara; and Stephen's three minor children) sue Nusbaum, Okami, the City of Henderson, HPD, and Henderson Police Chief Thedrick Andres for excessive force, familial deprivation, inadequate training, violating the Americans with Disabilities Act (ADA), and various state-law claims. The defendants move for summary judgment on all claims based on qualified immunity and the evidence shown by the officers' bodycam footage. For the reasons described herein, I grant the defendants' motion for summary judgment in part—with respect to the plaintiffs' claims arising under federal law—but decline to exercise supplemental jurisdiction over the plaintiffs' pendent claims and thus dismiss them without prejudice to the plaintiffs' ability to refile those claims in state court. I direct the Clerk of Court to enter judgment accordingly and close this case.

I. **Background**

    a. *Tara called 911 for emergency assistance.*

        On February 29, 2020, Stephen experienced a mental health crisis. Compl., ECF No. 7 at ¶ 27. His sister, Tara, called 911, reported that her "brother [was] having a psychotic break," and requested "some help." First 911 Call, ECF No. 10 at 00:20–00:30.[2] She warned the emergency

---

[2] The defendants filed their exhibits in support of their motion for summary judgment manually (*i.e.*, on a CD-ROM filed with the court). ECF No. 10. The CD-ROM contains recordings of Tara's two emergency calls, dashcam footage of the incident, HPD's radio traffic for the time surrounding the incident, and body-worn camera (BWC) footage from the two officers who responded to the incident. *Id.* For clarity, I

operator that Stephen had "pushed [her] dad down and pushed [her] mom against the garage and tried to choke her," reiterated her request for medical assistance, and noted that her family went "outside" as she was "not going in there with him." *Id.* at 00:50–01:40. Finally, she alerted the operator that Stephen had suicidal ideations, that he had bipolar disorder and schizophrenia, and that he had been placed on a mental-health hold (a "legal 2000") just two weeks earlier. *Id.* at 01:40–03:30. A few minutes later, Tara called 911 a second time to report that Stephen had moved into the front yard and that he "ha[d] a steak knife." Second 911 Call, ECF No. 10 at 00:06–00:11. On the second call, Tara stated, "he came out with another knife. He's in the front yard with my parents with a steak knife [inaudible] but it's still a steak knife, and we need to have the cops actually show up, like this is ridiculous, it's five minutes already." *Id.* at 01:00–01:35. The call ended when the operator informed Tara that officers were "pulling up now." *Id.* at 01:36. The 911 dispatcher then relayed much of that information to the responding officers, including that (1) Stephen was mentally ill and possibly suicidal, (2) Stephen had "pushed the dad and choked the mom," (3) Stephen had a knife, and (4) Stephen had been subject to a mental-health hold earlier in the month. HPD Radio, ECF No. 10 at 00:01–03:15, 07:25–07:27.

      b. *Officers Okami and Nusbaum arrived on the scene.*

Okami and Nusbaum responded to the dispatch and got out of their respective squad cars shortly after 12:17 p.m., parking a few houses down from the Douris residence. Nusbaum BWC, ECF No. 10 at 12:17:20; Okami BWC, ECF No. 10 at 12:17:17. Okami immediately retrieved his 40mm shotgun from his squad car's trunk and loaded a 40mm beanbag with a blue foam tip into the weapon. Okami BWC at 12:17:17–12:17:45. While Okami did that, Nusbaum spoke briefly to Tara and Debra. Nusbaum BWC at 12:17:30–12:17:50. Tara said that her father was

---

cite to each exhibit by name (e.g., "First 911 Call," "Nusbaum BWC") and timestamp when referencing those exhibits throughout this order. Timestamps for the body-worn camera footage refer to the actual time of day, whereas timestamps for the 911 calls and radio messages refer to the time elapsed within the respective media clips (as time-of-day information is unavailable).

inside the residence with Stephen and that her dad "got the knife, and then, I don't know." *Id.* at 12:17:41–12:17:43. Nusbaum told Tara and Debra that he would "take a quick look around" before walking toward the Douris residence. *Id.* at 12:17:45–12:18:00. At this point, Okami had rejoined Nusbaum, and the pair approached the Douris residence together. Okami BWC at 12:17:50–12:18:00. The sloping driveway of the Dourises' house had two cars parked on it, and a larger red truck obfuscated the officers' view of the garage. *Id.* But as they approached, the officers could hear shouting and saw Earl (Stephen and Tara's father) walk down the driveway while smoking a cigarette. *Id.* at 12:18:00–12:18:05. Stephen was a couple of steps behind Earl and was first sighted by the officers at 12:18:06 p.m. *Id.* at 12:18:06; Nusbaum BWC at 12:18:06.

        c.   *Within ten seconds, Stephen Douris was fatally shot.*

Stephen saw the officers and immediately brandished a knife, using his right arm to draw it forward from behind his back. Okami BWC at 12:18:06. Okami saw Stephen first, and said "hey, stop." *Id.* at 12:18:07. Okami added, "let me see your hands" and simultaneously raised the 40mm beanbag shotgun toward Stephen. *Id.* at 12:18:08. At this point, Stephen had the knife in his right hand, which was fully extended toward Nusbaum. *Id.* Stephen and Nusbaum were separated by one-and-a-half rectangular slabs of concrete sidewalk—no more than a few feet. *Id.* And Stephen was moving erratically and rapidly advancing toward Nusbaum. *Id.* at 12:18:07–12:18:08; Nusbaum BWC at 12:18:07–12:18:08. As Stephen closed the distance between himself and Nusbaum (the distance had then been reduced such that both men were standing on the same rectangular slab of sidewalk concrete), Okami fired the 40mm bag into Stephen's chest. Okami BWC at 12:18:09. Okami continued to yell, "stop," but Stephen was unimpeded by the beanbag round and marched forward. *Id.* at 12:18:09–12:18:10. Stephen seemed further aggravated, as he spread his arms and yelled, "what's up bitch," among other inaudible sounds. *Id.* at 12:18:10–12:18:11; Nusbaum BWC at 12:18:10–12:18:11.

Nusbaum reacted by retreating backwards down the sidewalk—still facing Stephen—and unholstering his firearm. *Id.* at 12:18:10–12:18:11. The pair of officers yelled at Stephen again to

4

"stop," "drop the knife," and "drop it." *Id.* at 12:18:11–12:18:13. But Stephen continued marching toward Nusbaum with his right arm extended, holding the knife. *Id.* Okami unholstered his own pistol, and both officers fired at Stephen, shooting him multiple times in the chest. *Id.* at 12:18:13–12:18:15. Stephen then fell over, fatally wounded. Nusbaum BWC at 12:18:16–12:18:18. As the BWC footage indicates, less than ten seconds elapsed between the officers' first sighting of Stephen and their use of lethal force. The officers then called for medical assistance and attempted to provide medical treatment to Stephen. *Id.* at 12:18:19–12:20:09; Okami BWC at 12:18:19–12:20:09. Eventually, additional support arrived, but it was too late. Stephen died from the gunshot wounds. ECF No. 7 at 10. Stephen's estate, his wife, children, parents, and sister now sue the defendants for various violations of state and federal law. *See generally* ECF No. 7.

## II.      Legal standard

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). At the summary-judgment stage, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed; the case must then proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). Once the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323. "To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018).

### III. Discussion

   a. *The officer defendants are entitled to qualified immunity on the plaintiffs' Fourth Amendment claim.*

The officer defendants who responded to the 911 calls, Nusbaum and Okami, argue that they are entitled to qualified immunity because their conduct did not violate any clearly established statutory or constitutional rights of which reasonable officers would have known. ECF No. 8 at 8–19. The plaintiffs disagree that qualified immunity applies in this case. ECF No. 20 at 16–26.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). While case law "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (cleaned up). In other words, "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). Such immunity "is effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The United States Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015) (quotation omitted). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers **are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue.**" *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix*, 577 U.S. at 13) (emphasis added).

Plaintiffs are unable to identify any "clearly established statutory or constitutional rights of which a reasonable person would have known" that Nusbaum and Okami violated.[3] And

---

[3] While the plaintiffs refer to a district court's criticism that the "Supreme Court's obsession with the clearly[-]established prong assumes that officers are routinely reading Supreme Court . . . opinions in their spare time, carefully comparing the facts in these qualified[-]immunity cases with the circumstances they confront in their day-to-day police work," ECF No. 20 at 22 n.9 (quoting *Caldwell v.*

6

"[e]ven when an officer violates a constitutional right, the officer will be granted qualified immunity if the use of force was rooted in a reasonable belief that, under the law at the time of the incident, the use of force was lawful." *Tan Lam v. City of Los Banos*, 976 F.3d 986, 999 (9th Cir. 2020).

In similar situations, the Supreme Court has held that qualified immunity should attach to police officers who acted similarly to Nusbaum and Okami when facing knife-wielding suspects who had previously resisted less-than-lethal uses of force. *See, e.g.*, *Kisela*, 138 S. Ct. 1148 (granting qualified immunity after officer shot plaintiff because he believed that she was a threat to a third party based on plaintiff's erratic behavior, wielding of large kitchen knife, and lack of response to officer commands); *Sheehan*, 575 U.S. 600 (holding that qualified immunity shielded officers that shot a plaintiff who refused to drop a knife, resisted pepper spray, and threatened them). The plaintiffs argue that "Ninth [C]ircuit decisions . . . clearly establish that police officers cannot shoot a person if he does not pose an immediate risk of harm to an officer or third party, even if the person is holding a weapon." ECF No. 20 at 23. But despite the plaintiffs' arguments to the contrary, *id.* at 26, there is no genuine dispute that Stephen posed an immediate risk of harm to Nusbaum, if not both officers. Stephen was nonresponsive to the officers' commands to "stop" and "drop" the knife he was holding. Nusbaum BWC at 12:18:09–12:18:11. He continued to advance toward Nusbaum while waving the knife in a threatening fashion. *Id.* He resisted a beanbag shot into his chest, *id.* at 12:18:12–12:18:13, and he continued to advance directly toward Nusbaum while moving his arm and brandishing the knife erratically. *Id.* at 12:18:12–12:18:15. From the moment that the officers first encountered Stephen, *id.* at 12:18:06, up until the moment that the officers employed lethal force, *id.* at 12:18:16, Stephen posed an immediate risk of harm to them.

---

*Univ. of N.M. Bd. of Regents*, 510 F. Supp. 3d 982, 1032 n.14 (D.N.M. 2020)), it is my role to faithfully apply the precedent established by the nation's highest court. As such, I apply the test for qualified immunity as it has been formulated by the Supreme Court, rather than interpose any alternative language that the plaintiffs might seek to introduce.

  The plaintiffs' statement that Stephen "did not aim his kitchen knife or otherwise make any aggressive gestures toward the responding officers," ECF No. 20 at 26, is plainly controverted by the BWC footage. Stephen aimed his kitchen knife toward Nusbaum as soon as the officers approached the scene. Nusbaum BWC at 12:18:09; Okami BWC at 12:18:09. Throughout the encounter, Stephen was within lunging or striking distance of Nusbaum. Okami BWC at 12:18:09. Okami's BWC footage displays exactly how close Stephen came to Nusbaum; Stephen accelerated toward Nusbaum quickly and forced him to retreat backward while unholstering his weapon. *Id.* at 12:18:10–12:18:13. The plaintiffs argue that "Stephen did little more than bear his chest to the officers while holding a kitchen knife in his hand pointed away from the officers." ECF No. 20 at 26. Again, the claim that the knife was "pointed away from the officers" is belied by the indisputable video evidence. Nusbaum BWC at 12:18:13; Okami BWC at 12:18:13. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (finding that the lower court "should have viewed the facts in the light depicted by [a] videotape" instead of the plaintiff's contradictory version of events). It is clear from the video that Stephen wielded the knife such that its tip was pointed toward Nusbaum, that Stephen was moving threateningly toward Nusbaum, and that Nusbaum attempted to retreat backwards but Stephen pursued him. Okami BWC at 12:18:11–12:18:17.

  The Ninth Circuit has held that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (citing *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996) (granting qualified immunity to police officer when a suspect, who had behaved erratically, swung a knife at him)). Regardless of whether a reasonable jury could conclude that Okami and Nusbaum's use of deadly force against Stephen was reasonable, "existing law did not place that conclusion 'beyond debate.'" *Singh v. City of Phoenix*, 2023 WL 2214335, at *10 (D. Ariz.

Feb. 24, 2023) (granting qualified immunity to police officer when a suspect moved toward an officer with a knife and ignored commands to stop or drop the weapon (citing *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021)).

The plaintiffs' expert Adam Bercovici—a retired Los Angeles Police Department officer—opines that the officers' failure to "create a plan, consider alternatives, [and] contact other resources was unreasonable." Pls.' Supp. Br., ECF No. 37 at 3 (citing Bercovici Rep., ECF No. 38 at 4–5). But the plaintiffs do not identify any clearly established right violated by such alleged failures. Their citation to *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), for the proposition that officers typically use "less forceful tactics" when "dealing with an emotionally disturbed individual . . . as opposed to a dangerous criminal," ECF No. 20 at 23–24, is constrained by the Supreme Court's analysis of that case. *See Kisela*, 138 S. Ct. at 1154 ("As for *Deorle*, this Court has already instructed [lower courts] not to read its decision in that case too broadly in deciding whether a new set of facts is governed by clearly established law."). Indeed, *Deorle* involved "a police officer who shot an unarmed man in the face, without warning . . . there were no bystanders nearby; the man had been 'physically compliant and generally followed all the officers' instructions'; and he had been under police observation for roughly 40 minutes." *Id.* (citing *Deorle*, 272 F.3d at 1276, 1281–82). *Deorle* involved facts clearly distinguishable from the instant case. Likewise, the plaintiffs' reliance on *Glenn v. Washington County*, 673 F.3d 864, 876–77 (9th Cir. 2011) is unavailing. The plaintiffs cite it for the proposition that a "desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force." ECF No. 20 at 23. But this ignores that *Glenn* concerned an individual who was only a threat to himself (holding a knife to his own neck, standing still, and not showing any aggression over the four minutes between the responding officers' first contact with him and the fatal shooting), rather than an individual wielding a knife in the direction of nearby officers.

1    I thus find that Nusbaum and Okami are entitled to qualified immunity based on the lack
of any clearly established right that they could have violated. As a result, I need not reach the
second prong of the qualified-immunity analysis and thus do not determine whether a Fourth
Amendment violation occurred. *See Kisela*, 138 S. Ct. at 1152 ("[T]he Court need not, and does not,
decide whether Kisela violated the Fourth Amendment when he used deadly force . . . [f]or even
assuming a Fourth Amendment violation occurred—a proposition that is not at all evident—on
these facts Kisela was at least entitled to qualified immunity."). Consequently, I grant summary
judgment on the plaintiffs' Fourth Amendment claim.

        *b.   I grant summary judgment on the plaintiffs' Fourteenth Amendment familial relationship claim.*

The Dourises also bring a claim for the officer defendants' alleged violations of their right
to due process. ECF No. 7 at 16. The Ninth Circuit has "recognized that parents have a
Fourteenth Amendment liberty interest in the companionship and society of their children."
*Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). "Official conduct that 'shocks the
conscience' in depriving parents of that interest is cognizable as a violation of due process." *Id.*
(citing *Porter v. Osborne*, 546 F.3d 1131, 1137 (9th Cir. 2008)). But "[i]n cases like this, where
officers must react quickly to a rapidly changing situation, the test is whether the officers acted
with a purpose of causing harm unconnected to any legitimate law enforcement objective." *Jones
v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1133 (9th Cir. 2017) (citing *Porter*, 546 F.3d at 1137,
1140). "[T]he purpose-to-harm test applies if the situation at issue 'escalated so quickly that the
officer had to make a snap judgment.'" *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022)
(cleaned up) (citing *Porter*, 546 F.3d at 1137). This test requires "a more demanding showing that
the officers acted with a purpose to harm the decedent for reasons unrelated to legitimate law
enforcement objectives." *Id.* (cleaned up). Legitimate objectives can include "arrest, self-
protection, and protection of the public." *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018).
Illegitimate objectives include "when the officer 'had any ulterior motives for using force against'
the suspect, such as 'to bully a suspect or get even,' or when an officer uses force against a clearly

harmless or subdued suspect." *Id.* (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 798 (9th Cir. 2014)).

The plaintiffs fail to present a genuine dispute as to whether the officers acted with a purpose of causing harm unconnected to a legitimate law enforcement objective. They provide an expert opinion critiquing the officers' handling of the situation and argue that the officers could have approached the scene differently. *See generally* ECF No. 37. But the officers were responding to an unknown threat, whom they were informed had already assaulted his parents and was armed with a knife. HDP Radio at 00:35–00:51, 07:25–07:40. As I have previously determined, there is also no genuine dispute that Stephen, upon the officers' arrival, immediately brandished his knife and moved erratically toward Nusbaum. The plaintiffs' claim that a jury could find that the officers' use of lethal force demonstrated "a purpose to harm [Stephen] under the circumstances," ECF No. 20 at 27, is unsupported by the evidence before me. There is no evidence that the officers sought retribution or vengeance against Stephen or even that they had any prior dealings with him. *See Ochoa*, 26 F.4th at 1058 (granting summary judgment on familial due-process claim because officers had no prior history with knife-wielding suspect whom they shot and killed). Ultimately, I find that the officers' use of deadly force was not "unconnected to any legitimate law enforcement objective," *Jones*, 873 F.3d at 1133, but rather was a reasonable response to a perceived threat on Nusbaum's life. Their actions comported with the legitimate objective of self-protection.[4] They were also acting to protect the safety of Stephen's family

---

[4] I also briefly address the plaintiffs' expert's suggestion that the officers created the exigency that led to the shooting, a position that other courts have found "legally and factually incorrect." *Hyer v. City and County of Honolulu*, 2023 WL 1766456, at *19 (D. Haw. Feb. 3, 2023). Factually, the plaintiffs ignore the undisputed evidence that Tara called the officers for help in subduing her brother, who had already acted violently toward his parents and was in possession of a deadly weapon. Legally, the plaintiffs must note that "[a] lawful action by police is not rendered unreasonable because it provokes a violent reaction." *Id.* (citing *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015)); *see also County of Los Angeles v. Mendez*, 581 U.S. 420, 421 (2017) (rejecting theory of liability that "uses another constitutional violation to manufacture an excessive force claim where one would not otherwise exist"). Plaintiffs' arguments that the responding officers should have used different tactics do not alter my analysis either; "even where officers have alternative means available, police officers need not avail themselves of the least intrusive means of responding but need only act within a range of reasonable conduct." *Hyer*, 2023 WL 1766456, at *19 (citing *Scott v. Heinrich*, 39 F.3d 912, 915–16 (9th Cir. 1994)). Arguments based on what the officers

members, two of whom were standing nearby. I thus grant summary judgment in favor of defendants on the Dourises' Fourteenth Amendment claim.

      *c.*   *I grant summary judgment on the plaintiffs'* Monell *claims.*

The plaintiffs also bring a § 1983 claim against the City of Henderson, HPD, and Henderson Police Chief Thedrick Andres, under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (permitting local governments and their agents to be sued under § 1983 under certain circumstances). ECF No. 7 at 12–14. Municipal liability attaches under § 1983 when a plaintiff can demonstrate that "(1) [they were] deprived of a constitutional right; (2) the municipality has a policy; (3) the policy amounted to a deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. City of L.A.*, 977 F.3d 737, 741 (9th Cir. 2020). "A plaintiff can satisfy *Monell*'s policy requirement in one of three ways." *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021). "First, a local government may be held liable when it acts 'pursuant to an expressly adopted official policy.'" *Id.* (quoting *Thomas v. County of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014)). "Second, a public entity may be held liable for a 'longstanding practice or custom.'" *Id.* (quoting *Thomas*, 763 F.3d at 1170). "Third, a local government may be held liable . . . when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Id.* (quoting *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled on other grounds by Castro v. County of L.A.*, 833 F.3d 1060 (9th Cir. 2016)). Policies "can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain obvious constitutional violations, and in rare instances, single constitutional violations [that] are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153

---

could have done differently do not create a genuine dispute of material fact. *Scott v. Harris*, 550 U.S. 372, 385 (2007).

(9th Cir. 2021) (internal citations omitted). But "generally, a single instance of unlawful conduct is insufficient to state a claim for municipal liability under § 1983." *Id.* at 1154.

The plaintiffs in this case allege that the municipal defendants inadequately trained Okami and Nusbaum and ratified the pattern and practice of misconduct by HPD officers. *Id.* at ¶¶ 48–50. The plaintiffs' allegations are somewhat unclear as to the latter theory of liability—they do not identify any specific policy, practice, or custom that HPD officers followed in carrying out their duties, nor do they allege a specific policy under which Okami and Nusbaum acted when they used lethal force on Stephen. *See generally id.* The extent of their policy-or-practice allegation substantively overlaps with their failure-to-train allegation. They make no allegation that HPD officers have a widespread practice of improperly using lethal force or that Chief Andres implemented any policies that resulted in officers improperly using lethal force. "To show ratification, a plaintiff must prove that the 'authorized policymakers approved a subordinate's decision and the basis for it.'" *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999). But the plaintiffs in this case make no such demonstration: they do not allege a single fact regarding Chief Andres—nor any other HPD policymaker—beyond conclusory recitations of the law. *See generally* ECF No. 7 at 12–14; ECF No. 20 at 28–29.

As for the plaintiffs' failure-to-train allegation: "[t]o allege a failure to train, a plaintiff must include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained [its] employees." *Benavidez*, 993 F.3d at 1153–54. Because I have already concluded that the undisputed material facts demonstrate that no constitutional violation occurred, the plaintiffs cannot meet the first element of a failure-to-train theory of liability. *See Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996) (stating that "a public entity is not liable for § 1983 damages . . . when the factfinder concludes that an individual officer . . . inflicted no constitutional harm to the plaintiff" (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)

("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the department regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."))). The plaintiffs' expert opines that HPD policy may have amounted to deliberate indifference, *see generally* ECF No. 37, but without a predicate constitutional violation, I find that the plaintiffs' failure-to-train claim fails. Summary judgment is thus appropriate on the plaintiffs' *Monell* claims.

### d. I grant summary judgment on the plaintiffs' ADA claim.

The plaintiffs bring a claim under the ADA against the City of Henderson and HPD. ECF No. 7 at 14–15. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Discrimination includes a failure to reasonably accommodate a qualified individual's disability. 28 C.F.R. § 35.130(b)(7). Public entities may be held vicariously liable under the ADA for acts of their employees. *Barbosa v. Shasta County*, 2022 WL 5060316, at *1 (E.D. Cal. Oct. 4, 2022) (citing *Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001)). In the Ninth Circuit, two types of Title II claims are applicable to seizures: "(1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as a criminal activity; and (2) reasonable accommodation, where police fail to reasonably accommodate a person's disability during an investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.* (citing *Sheehan v. City of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom.*, *City of San Francisco v. Sheehan*, 575 U.S. 6600 (2015)). Here, the plaintiffs assert that the police officers failed to reasonably accommodate Stephen's disability, causing Stephen to suffer greater injury than other arrestees might have suffered under the same circumstances. ECF No. 7 at ¶¶ 57–58. The gravamen of the plaintiffs' claim is that Okami and Nusbaum violated the ADA by escalating the situation and shooting Stephen. *Id.* The plaintiffs argue that "a reasonable jury

could conclude that the only reason Stephen began moving toward[] [O]fficer Nusbaum was as a result of being hit by the 40mm foam projectile round just seconds before[.]" ECF No. 20 at 31.

It is undisputed that Stephen suffered from schizophrenia, which constitutes a disability such that Stephen was a qualified individual under the ADA. Prior to the officers' arrival, Tara informed the 911 operator that Stephen was having a "psychotic break," that he pushed his father and tried to choke his mother, and that medical assistance was needed. First 911 Call at 00:30–01:30. She added that she "was not going [back] inside with [Stephen]" and that she "did not trust him." *Id.* at 01:30–01:41. It is unclear how much of this information was relayed to the responding officers, but it is also undisputed that the responding officers were informed to some extent of Stephen's history of mental illness, specifically, that Stephen had recently been the subject of a "legal 2000," a term used to reference a legal holding of a patient at a hospital for that patient's mental health. ECF No. 7 at 7; HPD Radio at 00:35–00:51.

But in a Title II ADA case, "the plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation." *Sommers v. City of Santa Clara*, 516 F. Supp. 3d 967, 989 (N.D. Cal. 2021) (citing *Sheehan*, 743 F.3d at 1233). It seems that the only reasonable accommodation that the plaintiffs have suggested is that "there was a car parked on the side of the road within two to three feet of the officers that they could have used as cover or a strategic barrier between them and Stephen to buy additional time and subsequently subdue him without the use of deadly force." ECF No. 20 at 31. They argue that a reasonable jury could conclude that the officers could have waited for back up, gained cover behind the parked vehicle, or generally used less-confrontational tactics. *Id.*; *see also* ECF No. 37 (plaintiffs' expert opines that the defendants could have used alternative tactics prior to confronting Stephen). The undisputed facts demonstrate that Stephen posed a direct threat to the officers and that the officers had no time to devise a reasonable accommodation after they confronted him. *See Moore v. City of Berkeley*, 2018 WL 1456628, at *5 (N.D. Cal. Mar. 23, 2018) ("A bare assertion that the defendant [officer]

acted unreasonably does not suffice to get the issue to a jury. Rather, a plaintiff must establish that he will be able to present evidence at trial tending to show unreasonableness.").

To the extent that the officers could have devised some reasonable accommodation prior to confronting Stephen, the plaintiffs have not presented evidence suggesting that such accommodation was possible. *See id.* ("Plaintiff has failed to put forth a basis from which a reasonable juror could find that the benefits of waiting to arrest [her] outweighed the risks of taking that course of action."). Bercovici, the plaintiffs' expert, opines that the responding officers could have contacted other resources prior to engaging Stephen, but he surmises that their failure to do so was based on inadequate training. ECF No. 40-2 at 4–5. He never concludes that the responding officers' failure to accommodate Stephen occurred solely because of his disability, but rather, that they "lacked the training to make [such] assessments." *Id.* at 13. But an alleged "failure to accommodate **must be solely by reason of disability**." *Hyer*, 2023 WL 1766456, at *26 (citing *Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)) (emphasis added). The plaintiffs' evidence may demonstrate that the responding officers failed to accommodate Stephen, but no reasonable jury could find—based on the evidence presented—that their actions were based on Stephen's disability. And courts may only rely on the evidence that the parties put in front of them. *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 260 (1st Cir. 2001) ("[S]ummary judgment decisions . . . often turn[] on the surprising failure by one party or the other to proffer any significant evidence in favor of their position."). Consequently, summary judgment is appropriate on the plaintiffs' ADA claim.

  e. *I decline to exercise supplemental jurisdiction over the remaining state-law claims.*

The plaintiffs' remaining claims include state-law causes of action for assault and battery, negligence, negligent supervision and training, wrongful death, and negligent or intentional infliction of emotional distress against all defendants. ECF No. 7 at 16–19. But I have already granted the defendants' motion for summary judgment with respect to the plaintiffs' § 1983, Fourteenth Amendment, *Monell*, and ADA claims. Under 28 U.S.C. § 1367(c), a district

court "may decline to exercise supplemental jurisdiction" where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Typically, "when federal claims are dismissed before trial . . . pendent state claims should also be dismissed." *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367–68 (9th Cir. 1992). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (internal quotation and citation omitted). This court, in its discretion, declines to exercise supplemental jurisdiction over the remaining state-law claims. *See, e.g., Vasquez v. City of San Jose*, 2022 WL 7219269, at *13 (N.D. Cal. Oct. 7, 2022) (citing *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1008 (9th Cir. 2010) (holding that district court acted within its discretion in declining to exercise supplemental jurisdiction after granting summary judgment on all federal claims)).

## IV. Conclusion

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment **[ECF No. 8] is GRANTED in part and DENIED in part**. I grant summary judgment as to the plaintiffs' first, second, third, and fourth claims. And I dismiss without prejudice the plaintiffs' state-law claims (plaintiffs' fifth, sixth, seventh, eighth, and ninth claims). Because I decline to exercise supplemental jurisdiction over the remaining state-law claims, I direct the Clerk of Court to enter judgment accordingly and CLOSE THIS CASE.

DATED: July 10, 2023

_____
Cristina D. Silva
United States District Judge